ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 AUG 27 PM 3:29

CLERK C Adams
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| IN RE: WILLIAM M. FOSTER, JR., | * | Bankruptcy No. 11-30021 |
| Debtor. | * | Chapter 11 proceedings |
| WILMINGTON PLANTATION, LLC, | * | |
| Appellant, | * | |
| vs. | * | CIVIL ACTION NO. CV 313-090 |
| WILLIAM M. FOSTER, JR., | * | |
| Appellee. | * | |

# O R D E R

This bankruptcy appeal arises out of the Bankruptcy Court's Order following trial, which sustained the debtor's, William M. Foster, Jr. ("Foster"), objection to a proof of claim by the Appellant Wilmington Plantation, LLC ("Wilmington"). Following denial of cross motions for summary judgment and a trial on the merits of Foster's defenses to Wilmington's claim, the Bankruptcy Court concluded that Wilmington's claim was barred on the bases of *res judicata* and judicial estoppel. (See Order of September 24, 2013, hereinafter referred to as the "Post-Trial Order".) Wilmington now seeks reversal of the Bankruptcy Court's Order and remand with instruction to allow its claim, subject to a

determination of damages. Foster seeks affirmance of the Order; alternatively, through his cross-appeal, Foster seeks affirmance based upon four additional defenses he had raised below. The Court held oral argument in the matter on July 31, 2014. For the reasons set forth below, this Court **AFFIRMS** the Bankruptcy Court's Post-Trial Order.

## I. JURISDICTION AND STANDARD OF REVIEW

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rules 8001 et seq. In reviewing a bankruptcy court's decision, the Court must accept the bankruptcy court's findings of fact, which "shall not be set aside unless clearly erroneous." Fed. R. Bankr. P. 8013; see also Club Assocs. v. Consol. Capital Realty Investors (In re Club Assocs.), 951 F.2d 1223, 1228 (11th Cir. 1992). "The bankruptcy court's findings of fact are not clearly erroneous unless, in light of all the evidence, [the court is] left with the definite and firm conviction that a mistake has been made." Westgate Vacation Villas, Ltd. v. Tabas (In re Int'l Pharmacy & Disc. II, Inc.), 443 F.3d 767 (11th Cir. 2005). In contrast, the Court reviews legal conclusions by the bankruptcy court de novo. In re Club Assocs., 951 F.2d at 1228.

## II. BACKGROUND[1]

In 1998, Foster purchased 19.846 acres of land on Wilmington Island, Georgia, upon which existed a preexisting structure known as the Oglethorpe Hotel. Foster intended to develop the site into a 265-unit condominium development, of which 45 units would be located within the old hotel and an additional 220 units would be located in nine yet-to-be built mid-rise buildings located on the property.[2] Foster's attorney prepared a Declaration of Condominium for recordation in Chatham County. The Declaration, however, failed to properly reserve the nine proposed building pads as "additional property" for future development because there were no metes and bounds legal descriptions for the building pads. As a consequence, the entire 19.846 acre tract was submitted to the condominium development.

---

[1] I will recount the facts relevant to resolution of the matter in summary fashion. These facts are the same as those found by the Bankruptcy Court in its Post-Trial Order, see Equitable Life Assurance Soc'y v. Sublett (In re Sublett), 895 F.2d 1381, 1384 (11th Cir. 1990) (stating that the district court is not authorized to make independent factual findings), and are supplemented where necessary by the factual statements contained in the parties' Joint Pretrial Statement. Upon review, this Court has determined that the facts found by the Bankruptcy Court are not clearly erroneous but are supported by the record and reinforced by the statements of counsel at the oral argument on July 31, 2014.

[2] The parties often refer to the conceptual locations or the footprints of the nine additional buildings as "pads."

This omission became apparent when several of the purchasers of the condominium units in the old hotel brought a quiet title action against Foster in the Superior Court of Chatham County ("the Sheffer Quiet Title Action"). The condominium owners claimed that they owned an undivided joint interest in the "common areas" of the 19.846-acre tract. At this time, Foster had contracted to sell the nine building pads to Wilmington through a Purchase and Sale Agreement ("PSA").

Under the PSA, executed on August 16, 2004, Foster agreed to sell "[a]ll that certain lot, tract or parcel of real estate . . . more particularly described in Exhibit 'A' attached hereto, consisting of nine (9) condominium pad sites for a two hundred twenty unit (220) expansion of Wilmington Plantation . . . ." Foster also agreed to convey "good and marketable fee simple title in and to the Property." A critical dispute in this case is whether Wilmington intended to purchase the entire 19.846-acre tract (less and except the old hotel) or only the nine building pads. The purchase price was $13.2 million.

The Sheffer Quiet Title Action was an impediment to the sale of the property; however, in June 2005 Foster and the Sheffer Quiet Title Action plaintiffs entered into a Settlement Agreement whereby the plaintiffs agreed to cancel

the filed *lis pendens* notice and execute quitclaim deeds to Foster that would convey any interest of the unit owners necessary to allow completion of the development of the property. On August 2, 2005, Wilmington and Foster closed on the PSA, both believing in good faith that any title problems had been resolved. Foster executed a general warranty deed. Also, two title insurance policies were issued to Wilmington – an owner's policy and a loan policy.[3]

In November 2005, the Sheffer Quiet Title Action plaintiffs filed a motion to enforce settlement, arguing that Foster had failed to honor repair and construction warranties. Wilmington moved to intervene in the lawsuit to protect its interests. Also, another condominium owner filed a quiet title lawsuit against Wilmington (the "Radinick Quiet Title Action"), which was virtually identical to the suit filed in the Sheffer Quiet Title Action. Two additional lawsuits were filed against Wilmington in the Superior Court of Chatham County by Wilmington Plantation Owner's Association, Inc., the condominium owners' association of the old hotel building (the "Homeowners' Association"). The first sought relief relating to the Homeowner's Association's board of directors. The

---

[3] Wilmington's lender was AmSouth Bank. On the closing date, AmSouth Bank recorded a deed to secure debt, security deed, and assignment of lease and rents in the Chatham County Superior Court. These documents evidenced a secured note in the amount of $9.2 million.

second sought injunctive and declaratory relief to block the construction of the additional buildings on the site.

The Superior Court consolidated the four pending lawsuits, and in July 2006, the court conducted a three-day mediation, announcing the purpose of the mediation was to resolve all outstanding issues to include the "cloud on the title involving the development of the associated sites on that property." At the conclusion of the hearing, the parties jointly read into the record a settlement announcement. Counsel for homeowner Radinick stated:

> We have also worked up a proposed first amendment to the declaration that reflects that removal of these nine pads from the area in the declaration so as to effectuate their being a reformation of the original declaration. . . . [T]here's an agreement that [Wilmington] is obligated under any circumstances to submit any of this property that's defined in two of the terms of the declaration of covenants, but they have seven years from [July 19, 2006] to do that, to bring that property in and to submit it to the declaration for the terms of the covenant and declaration. It's my understanding also, and this applies to all of the pending actions, that the parties have relinquished their rights to pursue the recovery of attorney's fees against the other, and we anticipate that the parties will execute a global or mutual release of any and all liability other than as agreed hereto today.[4]

On September 20, 2006, a "Consent Order" was entered, memorializing the terms of the settlement announcement.

---

[4] Counsel for Wilmington also stated that it was "a global settlement of all issues and all, you know, anything that may be pending . . . ."

Critically, the Consent Order contained the following provisos relative to title:

- The Declaration would be reformed prospectively (taking effect on July 19, 2006) by an Amended Declaration which defined nine new building sites on the 19.846-acre tract as "additional property" for future development;

- AmSouth's security deed only encumbered the nine new building pads on the 19.846-acre site; and

- Wilmington acknowledged holding title to the nine new building pads described in the Amended Declaration.

Thus, through the Consent Order, any dispute the parties had about whether the sale of property from Foster to Wilmington was for the entire 19.846-acre tract or just the nine building pads was consensually resolved in Foster's favor. (See "For the Record" Tr. of Oral Argument on July 31, 2014, at 10:26 a.m.)

Moreover, the Consent Order contained a release provision in Paragraph 12, which reads as follows:

> It is the intent of all parties that this Order constitutes a global settlement of all issues pending in each of the referenced cases. . . .
>
> . . . .
>
> The parties specifically except and exclude from the release any claims or potential claims between Mr. Foster and [Wilmington] relating to expenditures pertaining to the homeowners association or the development of the property that are not part of the quiet title action which is before the Court. Additionally, any claims by the [Homeowners'] Association against Mr. Foster and his claims against it relating to homeowners

> association dues for payments advanced are not part of this agreement.

The Consent Order and the Amended Declaration attached thereto were recorded in the deed book of Chatham County. During oral argument on July 31, 2014, the presiding judge requested a legible, enlarged or original version of the plat attached to the 2006 Consent Order, which is marked as Exhibit A-1 to the Amended Declaration. The parties produced an enlarged version of a plat that approximates the original plat, through which the Court can ascertain that the nine building pads or footprints of the proposed nine buildings are described by magnetic courses and distances.[5] (This enlarged plat is

---

[5] The "Consent Order" presented for entry by the Superior Court was an abundant opportunity for all of the parties. Indeed, it appears that each of the litigants had bona fide intentions to resolve all existing conflicts. The level of give and take they employed in the process negates any suggestion of deceit or effort withheld. The "Merits Brief of Appellants" correctly observes:

> The lamentable facts here do not arise from the intent of the parties, but from the acts or omissions of the professionals hired to effectuate that intent. First, Foster's attorney erred in failing to preserve the right to develop the additional 220 units on the 20-acre tract in the Declaration upon its creation in 1998. Second, the title company's agent and closing attorney failed to catch the error when the sale closed and the Warranty Deed was recorded. Third, all of the attorneys involved with the Consolidated Litigation . . . failed to construct a Consent Order capable of quieting marketable title in Wilmington and ensuring Foster honored his construction warranty commitments.

identified as Trial Exhibit 72.) Wilmington notified the Court on August 1, 2004, that the parties have conferred and are unable to find an exact copy of the requested plat. (Doc. No. 27.)

Following the entry of the Consent Order, Wilmington hired architects to design buildings to be constructed, produced marketing materials to facilitate the pre-sale of units, and retained real estate agents to market and pre-sell units in the first proposed building. Wilmington sought financing, representing itself to be the owner of the nine

---

(Doc. No. 4, at 17.) Accordingly, despite the best efforts of the parties, the professionals to whom their intentions were entrusted failed, time and again.

Moreover, a close review of the plat submitted at oral argument (Tr. Ex. 72) leaves the presiding judge with grave doubts as to the validity of the nine separate property descriptions set forth in Exhibit A-2 to the Amended Declaration and depicted on the plat in Exhibit A-1 of the Amended Declaration. Courses and distances cannot necessarily suffice for "metes and bounds." Of equal importance to the closure of a description is the accurate verbal or visual depiction of its point of origin – in this case Point A. See Callaway v. Armour, 208 Ga. 136, 139 (1951) (finding a property description insufficient where there is no definite beginning point); Dodd v. Madaris, 206 Ga. 497, 499 (1950) (holding that, in a suit for land, a property description with "an unascertainable starting point is unquestionably too indefinite and uncertain to afford a basis for any identification of the property sought to be recovered"); Gould v. Gould, 194 Ga. 132, 136 (1942) (finding a property description's "weakness in respect to defining the beginning point on locating the boundaries . . . fatal"). Thus, the ultimate result of the parties' efforts to settle their differences through the Consent Order and Amended Declaration may have been frustrated for yet another reason not discussed in the decision of the Bankruptcy Court.

9

building pads. Wilmington never constructed any of the proposed buildings however.

In February 2008, Foster filed a motion to set aside the 2006 Consent Order in the Superior Court based upon repair disputes he was having with the Homeowners' Association. Specifically, Foster attacked the validity of the Consent Order. Wilmington opposed the motion, contending that it and others had relied upon the validity of the Consent Order. The Superior Court denied the motion to set aside the Consent Order.

On August 11, 2010, Wilmington filed a complaint in the Middle District of Georgia against Foster asserting claims of breach of contract and breach of the warranty of title. When Foster filed a petition for relief under Chapter 11 in the Bankruptcy Court of the Southern District of Georgia, Wilmington filed a proof of claim in the amount of $21,138,884 based upon its legal claims in the Middle District of Georgia. Foster objected to this proof of claim, raising several defenses.

In resolving Wilmington's proof of claim, the Bankruptcy Court denied cross motions for summary judgment by the parties and thereafter conducted a three-day trial of the matter on April 3-5, 2013. On September 24, 2013, the Bankruptcy Court entered its Post-Trial Order denying Wilmington's proof of

claim. Wilmington appealed to this Court, and Foster filed a cross-appeal.

### III. LEGAL ANALYSIS

As pointed out by Wilmington's counsel at oral argument, the 2006 Consent Order is the fulcrum of the Bankruptcy Court's Post-Trial Order, and rightfully so. At the summary judgment stage, the Bankruptcy Court had determined that the release provision of the Consent Order was ambiguous and therefore conducted a trial to ascertain the intent of the parties. (See Bankruptcy Court Order of January 16, 2013.) In its Post-Trial Order, the Bankruptcy Court aptly detailed the evidence respecting the parties' intent, to include the testimony of Thomas Nash, Esq.[6] Moreover, the Bankruptcy

---

[6] Nash was Foster's attorney during the mediation process in the state court proceeding. At the trial in Bankruptcy Court, he explained the release provision as follows:

> My intent with regard to this and following four lawsuits and three days of mediation was to resolve every single matter that was pending that could have been pending or that was raised in any way regarding this development. And I believe we carved out two very limited exceptions that dealt with usage of Mr. Foster's open accounts [and] a claim by the homeowners' association for common area expenses. And that was it. Everything else was supposed to have been totally and completely resolved.

Additionally, Foster testified that he had spent $2.4 million in satisfaction of all his obligations under the 2006 Consent Order and would not have done so if he thought title issues

11

Court examined the effect of the Consent Order, that is, the vesting of title in the nine building pads to Wilmington. As the Bankruptcy Court pointed out: "In the amended Declaration attached to the 2006 Consent Order, Wilmington Plantation was named the declarant and agreed to title to nine building pads, and Wilmington was given seven years to add additional property [to the condominium development]. . . . Wilmington Plantation cannot now assert a claim against Foster that it was entitled to the entire 19.846 acres."

While the Post-Trial Order's analysis and conclusions of law fall under the heading *res judicata*, the reasoning encompassed therein as it pertains to the release provision of the Consent Order is sound and supported by the evidence.[7] And, upon a *de novo* review, this Court agrees that as a matter of contract, Wilmington agreed to release its claims pertaining to title matters through the 2006 settlement of title issues and therefore cannot reassert those claims in this bankruptcy case.

It appears that the performance of several attorneys has fallen short of adequacy in the course of this case-from the

---

still remained between the parties. Finally, Ken Kraft, a member of Wilmington, testified at trial that Wilmington believed the Consent Order resolved the title issues as to the nine building pads and that Wilmington would have fee simple title and be able to develop the property.

[7] Here, the Court adopts and incorporates herein as its own the conclusions of law expressed by the Bankruptcy Court pertaining to the release provision of the Consent Order at pages 34-37 of the Post-Trial Order.

12

attorney who drafted the original Declaration of Condominium to those who drafted and condoned the inartfully crafted Consent Order and those who, presumably, may have failed to execute any documents necessary to assure marketable title was vested in Wilmington. (See note 5 supra.) This may be, as Wilmington suggests, lamentable. However, neither this Court nor the Bankruptcy Court are obligated to cure these defects or to do what the parties (or their lawyers) have failed to do, as Wilmington suggests when it asks: "Should this layering of professional error preclude legal and equitable relief to the parties . . . ." (Doc. No. 4, at 17.) Instead, this Court and the Bankruptcy Court are obligated to resolve the questions presented based upon the facts and applicable law.

In short, Wilmington, represented by counsel, entered into a settlement agreement through the mediation process in Superior Court in 2006, whereby it agreed that it had title only in the nine building pads and agreed that a global release of claims between the parties was therefore appropriate. Wilmington's protestations that it does not now have good marketable title are irrelevant to the determination of whether it previously released its claims involving title against Foster. Because of the release, it cannot now assert claims of breach of contract and breach of warranty of title against Foster through its proof of claim.

### IV. CONCLUSION

Upon the foregoing, the Bankruptcy Court properly sustained Foster's objection to Wilmington's proof of claim. Accordingly, the Post-Trial Order of September 24, 2013, is hereby **AFFIRMED**. The Clerk is directed to **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 27th day of August, 2014.

_____
UNITED STATES DISTRICT JUDGE

14